# BRADLEY LAW FIRM
## A PROFESSIONAL CORPORATION

MICHAEL D. BRADLEY
ATTORNEY AND COUNSELOR AT LAW

2 PARK AVENUE, 20TH FLOOR
NEW YORK, NY 10016
(212) 235-2089
FAX: (212) 878-8819
MBRADLEY@BRADLEYLAWFIRMPC.COM

May 12, 2021

**VIA ECF & US MAIL**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *U.S. v. Jeffrey Estevez*
       **18 Cr. 669 S1 (JPO)**

Dear Judge Oetken:

This letter is respectfully submitted pursuant to Rule 32 of the Federal Rules of Criminal Procedure and sets forth several matters that Mr. Estevez will raise to aid in the determination of an appropriate sentence, serving the interests of justice and sentencing goals of 18 U.S.C. § 3553(a). Mr. Estevez was arrested on September 5, 2018, and has been detained since his arraignment in the Southern District of New York ("SDNY"). On November 9, 2020, Mr. Estevez pleaded guilty to brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii) and 2 pursuant to a plea agreement with the Government. As a result of his background and personal characteristics, Mr. Estevez concurs with the recommendation of U.S. Probation and respectfully requests that the Court impose a sentence of 84 months' incarceration.

## BACKGROUND

Mr. Estevez was born in the Spring of 1994, to parents Diogenes and Maria Estevez.[1] He and his three brothers were raised in a strict household in the Bronx, New York. Their parents worked hard to provide for them: Mr. Estevez's father worked in building maintenance and his mother was a home attendant. Jeffrey's childhood was adequate; although his family struggled to make ends meet, he felt supported by his mother. When Jeffrey was around 12 years old, his parents separated. Jeffrey was devastated by his father's absence. Though his father continued to contribute to the household financially, Jeffrey dearly missed his father's immediate presence in the home.[2]

---

[1] PSR ¶ 80.
[2] PSR ¶ 82.

While many of his friends were homeless or living in squalor with little to no adult supervision, Jeffrey considered himself fortunate to have a loving mother and a place to call home. As his childhood companions suffered abject poverty, Jeffrey's basic needs were being met, though barely. In this context, it is no surprise that he would consider his modest upbringing as "not really that bad."[3] Additionally, he excelled in grade school, having achieved high marks and certificates in various subjects.[4]

Unfortunately, despite his mother's support, young Jeffrey would eventually succumb to the negative influences of his friends and peers. He frequently witnessed drug activity and gang-related violence in the neighborhood. Around ages 12 to 14, he began drinking alcohol and smoking marijuana;[5] as he became older, he did so on a regular basis to fit in with his peers. He looked up to older boys and young men who hung out in the streets, leading him to fall into the wrong crowd. Lacking a positive male role model in his home to guide him, Jeffrey emulated the negative behavior that surrounded him. He observed other kids selling drugs to support their families, and he followed their example, leading to his involvement in the criminal justice system at a very young age. Unfortunately, Mr. Estevez's poor choices thwarted his attempts to further his education, though he did eventually attain his GED.[6]

Around age 20, Mr. Estevez became a father for the first time. He felt overjoyed but also crushed by the weight of responsibility of properly raising and providing for a child, especially at such a young age. Around the same time, Mr. Estevez became addicted to Percocet and Xanax.[7] Rather than confide in his family, he hid his prescription drug abuse from them and most of his friends. At first, he took pills sporadically, occasionally using them along with marijuana. But before he knew it, he became a "functioning" drug addict. This swift progression occurred almost imperceptibly – by the time he was in the throes of addiction, he barely recognized himself. He withdrew from friends and family due to the shame and embarrassment of addiction and resumed his unlawful behavior to support his habit and to provide for his family. Determined to overcome this addiction, Mr. Estevez enrolled in a substance abuse program while at MCC in February and March 2020.[8]

In 2017, while incarcerated at Rikers Island, Mr. Estevez was assaulted with a knife, resulting in a cut to his neck which required several stitches to close.[9] He suffered severe pain and anxiety from the incident itself, and he was prescribed pain medication for the injury. Mr. Estevez was later diagnosed with Post-Traumatic Stress Disorder and bipolar disorder.[10]

In the past, Mr. Estevez has worked as a sales representative at Boost Mobile.[11] From 2018 until his arrest in this matter, he worked full-time at two Metro PCS stores earning $500 plus

---

[3] PSR ¶ 82.
[4] *See* Exhibit A.
[5] PSR ¶ 92.
[6] PSR ¶ 96; *see* Exhibit B.
[7] PSR ¶ 93.
[8] PSR ¶ 94.
[9] PSR ¶ 89.
[10] *Id.*
[11] PSR ¶ 100.

commission.[12]   Upon his release, Mr. Estevez wants to open a daycare center, combining his entrepreneurial aspirations with his love for children.[13] He deeply desires to turn his life around so that he can become an inspiration to young people.

The mistakes and poor decisions Mr. Estevez made have cost him his liberty and caused him to be absent from his children's lives.  More than anything, he takes his role as a father very seriously and places his children's needs above his own.  He wants to be there for his children and wants them to grow up knowing their father.  He yearns to provide guidance, support and protection for his children and, most of all, to become a constant, positive presence in their lives.

## <u>THE APPROPRIATE SENTENCE</u>

The Court is required to consider the factors set forth in Title 18 U.S.C. § 3553(a) and to impose a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of § 3553(a).  Mr. Estevez is remorseful for his conduct and its subsequent impact on the community.  He fully acknowledges his wrongdoing and is apologetic to all who have suffered as a result of his actions.  After a review of Mr. Estevez's life and circumstances, a sentence of 84 months' incarceration is appropriate, reasonable, and thus warranted in this case. Pursuant to his plea agreement, the Guidelines sentence for Count Six is the minimum term of imprisonment required by statute. Count Six requires a mandatory minimum sentence of 84 months.

**1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1));**

**a.  Nature and circumstances of the offense:**

The offense to which Mr. Estevez pleaded guilty is undoubtedly serious.  He brandished a firearm in furtherance of a crime of violence.   Mr. Estevez accepts responsibility for the poor decisions he made.  He understands the severity and seriousness of his behavior and regrets the harm he caused to others.  He is deeply remorseful for his part in this crime and is ashamed of his actions.  He acknowledges that his activities contributed to the very environment that negatively affected his life.  This irony is not lost on Mr. Estevez, and he is finally determined to break the cycle.

**b.  History and characteristics of the defendant:**

Mr. Estevez spent his childhood watching his family struggle financially.  In a letter attached as "Exhibit C," Mr. Estevez's mother, Maria, writes: "he was a hard-working guy, he helped me out with the bills, because I am separated from his father." Unfortunately, Mr. Estevez's desire to provide for his growing family, coupled with his unique background and characteristics, led him to engage in unlawful behavior.  His mother observes as much, writing: "my son is a great human being, and a very smart person, but the circumstance[s] sent him to another situation."[14] While his background in no way excuses his involvement, nor in any way diminishes its

---

[12] PSR ¶ 99.
[13] PSR ¶ 101.
[14] *See* Exhibit C.

seriousness, it does render his actions all the more understandable and provides substantial mitigation in determining an appropriate sentence that serves the ends of justice. Mr. Estevez acknowledges that he exhibited poor judgment in committing this crime and wants to make amends. His parents separated when he needed his father most. Now that Mr. Estevez himself is a father with three children of his own, he vows to always be there for his family.

**(2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C));**

A sentence of 84 months' incarceration is warranted in this case and will provide sufficient punishment for the offense and protect the public from further crimes of the defendant. A sentence within the Guidelines' range is far beyond what is necessary to achieve the goals of 18 U.S.C. § 3553(a). In addition to the sentence he receives, Mr. Estevez is also going to suffer the collateral consequences of this conviction for the rest of his life. These consequences "serve no useful function other than to punish criminal defendants after they have completed their court-imposed sentences."[15] He will carry with him the stain of being a federally convicted felon until the day he dies. This will undoubtedly further limit his prospects and opportunities for employment and continued education. He will not be allowed to vote in some states or obtain licenses needed for many jobs and will face restrictions on housing, financial aid for college and public benefits. However, as he did when previously incarcerated, Mr. Estevez plans to avail himself of drug treatment and vocational options while serving his sentence, especially as previously available opportunities have been severely curtailed during this pandemic.

The relative harshness of Mr. Estevez's pre-sentence confinement bears on sentencing, insofar as one of the purposes of sentencing is to afford just punishment for the offense and respect for the law. For over 32 months, Mr. Estevez has been confined in pre-trial detention at MCC Manhattan, a jail not "designed for long term stays."[16] Even under the best of circumstances, inmates' movements are severely restricted at all times and they have little opportunity to participate in social programs, limited access to personal development programs, exercise, physical training or recreation, and almost no opportunities to be outdoors.

The last year, of course, has presented the worst of conditions. The COVID-19 crisis has hit prisons and jails throughout the country disproportionately to the rest of the population. In response, the BOP has imposed draconian restrictions on inmates. On February 27, 2020, the MCC entered a two-week lockdown while guards and marshals searched the facility for a smuggled, loaded firearm.[17] His cell was searched numerous times because the gun was allegedly located somewhere on his tier. Beginning in March 2020, the BOP implemented phase 2 of their

---

[15] *US v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. May 24, 2016).

[16] *See United States v. Behr*, 2006 WL 1586563 *5 (S.D.N.Y. 2006) (Sweet, J.) (further noting that harsh conditions at MCC were recognized by Judge Kimba Wood as a basis for a substantial sentence reduction); *see also, United States v. Saldana,* 17 Cr. 512, ECF No. 535 at 16–17 (S.D.N.Y. Sept. 10, 2019) (Wood, J.) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that.").

[17] Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, The Daily News (Mar. 6, 2020), at https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306- aws7qoa7ejcozai3i64hms73qi-story.html.

response to the pandemic. Social and legal visits were suspended for 30 days and inmate movement was restricted. Since that time, Mr. Estevez's unit has often been in lockdown, including as of this writing, with little communication with family and no social visits.[18] Many inmates, including Mr. Estevez, were housed in crowded, open dormitories in which 26 men slept in bunk beds, spaced three to five feet apart, and shared a single toilet, urinal, sink and shower.[19] Prisoners were not provided with access to the soap and hygienic products they needed to sanitize their environments and stay safe.[20] Testing was all but nonexistent.[21] For most of the past 14 months, inmates have been kept in their cells for 23 hours a day, and denied basic living essentials such as hot meals and regular showers.

Moreover, Mr. Estevez suffers from hypertension, which places him at higher risk for severe COVID-19 infection.[22] His resting right arm blood pressure was taken on July 2, November 6 and November 13, 2019, and the readings were as follows, respectively: 133/86, 152/94 and 136/93.[23] His November left arm readings were even higher: 158/100 and 144/99. [24] These results place him in the categories of stage 1 and stage 2 hypertension.[25] Ongoing studies continue to explore the full extent of the deadly toll of COVID-19 on hypertensive patients.[26] But what we do know is that the disease is highly contagious, attacking indiscriminately, young and old;[27] that hypertension was the most common underlying condition among hospitalized COVID-19 patients admitted during March 2020;[28] that from the onset of the pandemic, over 8% of coronavirus patients with pre-existing hypertension died from COVID-19;[29] and that among those perishing from the disease in New York, hypertension is the most frequently occurring comorbidity factor.[30]

---

[18] There have been 46 weeks since March 31st, when the BOP lockdowns started. *See* Kevin Johnson, *Federal prison officials order system-wide lockdown in bid to limit coronavirus spread*, USA Today (Mar. 31, 2020) at: https://bit.ly/3erMUHx.

[19] *See Cesar Fernandez-Rodriguez et al. v. Marti Licon-Vitale*, 20 Civ. 3315 (ER), Petition, ECF No. 1 at 15 (April 28, 2020).

[20] *Id*. at 16.

[21] *Id.* at 17.

[22] *See* Lei Fang, et al., *Are patients with hypertension and diabetes mellitus at increased risk for COVID-19 infection?*, The Lancet (March 11, 2020), at https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext (last visited May 11, 2021).

[23] *See* Exhibit D.

[24] *Id*. There does not appear to be a left arm reading for July 2, 2019.

[25] *See Understanding Blood Pressure Readings*, American Heart Association, at https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited May 11, 2021).

[26] *See* Tadic, Marijana et al. "Hypertension and COVID-19: Ongoing Controversies." *Frontiers in cardiovascular medicine* vol. 8 639222. (Feb. 17, 2021), at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7925389/ (summarizing recent studies and concluding that chronically hypertensive patients are often at increased susceptibility for SARS-CoV-2 and elevated risk of unfavorable outcomes).

[27] *See Hundreds of young Americans have now been killed by the coronavirus, data shows,* April 8, 2020 at *https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/* (last accessed May 11, 2021).

[28] *See Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019*, at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm (last visited Apr. 10. 2020).

[29] *See Report of the World Health Organization-China Joint Mission on COVID-19* at https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[30] *See NYS COVID-19 Tracker* updated regularly at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last accessed May 10, 2020).

In recent sentencing proceedings, several Courts in our District have heavily weighed the harsh pretrial confinement conditions at the MCC among the § 3553(a) factors, many imposing significant downward variances as a result.[31] And as this Court recently opined in this very case, during the sentencing of co-defendant Daniel Gonzalez, the pretrial detention conditions at MCC during this pandemic are at least one and a half to two times as harsh as normal confinement.

Mr. Estevez is reflective of his past behavior, acknowledges his mistakes and regrets his actions. He knows that his poor choices will cause him to miss important moments and milestones in his children's lives. However, he has learned from his past experiences and is focused on being a father to his children.

## CONCLUSION

Mr. Estevez understands the seriousness of his offense and is remorseful for his actions. When Mr. Estevez's involvement in this offense is viewed against the backdrop of his personal history and characteristics, it is clear that the proposed sentence to a term of eighty-four (84) months imprisonment is both reasonable and appropriate. Mr. Estevez respectfully reserves the right to raise additional issues at the time of sentencing. The Court's time and consideration of this submission is greatly appreciated.

Respectfully submitted,

Michael D. Bradley
Margaret M. Shalley

cc:    AUSA Jacob Warren (*via ECF*)
       AUSA Christopher Brumwell (*via ECF*)

---

[31] *See US v. Gonzalez*, 19 Cr. 708 (AKH), May 22, 2020; *US v. Alvarez*, 19 Cr. 622 (DLC), Dec. 16, 2020; *US v. Mamolejo*, 20 Cr. 1 (JSR), Feb. 3, 2021; *US v. Nettles*, 20 Cr. 509 (KPF), March 12, 2021; *US v. Browning*, 20 Cr. 2 (VSB), March 17, 2021; *US v. Soto*, 19 Cr. 903 (KMW), March 19, 2021.